[No. 23622.   *En Banc.*   ·July 11, 1932.]

J<small>AMES</small> D. L<small>ACEY</small> & C<small>OMPANY</small>, *Respondent and Cross-appellant*, v. T<small>IMOTHY</small> H. M<small>C</small>C<small>ARTHY</small> *et al.,*
*Appellants.*[1]

[1]Reported in 13 P. (2d) 11.

*Caldwell & Lycette* and *William H. Griffin,* for appellant McCarthy.

*Peters, Evans & McLaren,* for appellant Ruddock.

*Chadwick & Chadwick* and *Barthell & Rundall,* for respondent and cross-appellant.

PARKER, J.—This action was commenced in the superior court for Clallam county by the plaintiff, James D. Lacey & Company, a corporation, as assignee and successor in interest of James D. Lacey & Company, a co-partnership, seeking recovery of damages from the defendants, Timothy H. McCarthy and Albert Billings Ruddock, as executor of the estate of Charles H. Ruddock, deceased, claimed as the result of a breach by McCarthy and Charles H. Ruddock, deceased, of their obligations under the following contract:

"THIS AGREEMENT, made this June 1st, 1906, between Charles H. Ruddock of New Haven, Connecticut, and T. H. McCarthy, of New Orleans, Louisiana, as first parties, and James D. Lacey, Wood Beal and Victor Thrane, composing the firm of James D. Lacey & Company, of Chicago, Ill., and New Orleans, La., as second parties, WITNESSETH:

"(1)  Said parties hereto have heretofore, to-wit: on the 16th day of May, 1906, purchased from the Allegheny Lumber Company and Conewango Lumber Company, West Virginia corporations, certain lands in the county of Clallam, state of Washington, aggregating about seven thousand one hundred acres and more fully described in copies of deeds from said Companies annexed hereto, excepting North Half of North-west quarter of Section Twelve (12) Township Twenty-eight (28) North Range Fourteen (14) West which was purchased from The Conewango Lumber Company on same date as other lands but copy of deed is not annexed hereto.

"(2)  Payment in full for said lands was made by said first parties hereto and title to the lands is in their names.

"(3)  It is hereby agreed that the amount first parties have invested in said lands is the sum of Three Hundred and Fifty-Five Thousand Five Hundred and Fifty-Four and Twenty-one hundredths ($355,554.21) Dollars, that is to say said sum is the first cost of said lands.

"(4)  It is further agreed that said parties of the first part will furnish the money necessary to pay taxes on said lands for the year 1906, as well as for the necessary expenses during the year 1906, and that they will hereafter furnish what money is required for taxes and other necessary expenses in caring and protecting said property while they hold it. They are to have and receive all rents and other income derived from said property or in connection with it, and they will keep correct books of account showing all expenditures or receipts for or on account of said property or in connection with it, beginning said account with the item of Three hundred and fifty-five thousand five hundred and fifty-four and twenty-one hundredths

($355,554.21) Dollars as of May 16th, 1906, which is the amount said first parties had invested in said property on that date. They will charge interest on the amount of their investment and all other expenditures made by them at the rate of six per cent (6 per cent) per annum, making the first charge hereafter on December 31st, 1906 and annually thereafter and credit themselves on said books accordingly.

"(5) Second parties have rendered valuable services in estimating said property, securing option on it and assisting in the purchase thereof. They agree that they will use their best efforts and ability in finding purchasers for the property and in looking after its sale, and that they will make no charge for purchasing, looking after the sale or selling said property, or for any services that they may have heretofore or may hereafter render in connection with it.

"(6) The parties of the second part further agree to sell any or all of said lands at such time and for such a price as may be indicated by the parties of the first part, provided, however, that a reasonable profit shall be obtained.

"(7) When said property shall be sold in part or in whole, the money received shall be applied, 1st. To reimburse first parties for moneys advanced by them for purchase price of the property and their disbursements in caring for and protecting it, together with interest at six per cent (6 per cent) per annum as before mentioned, and less the amounts of receipts received by them for and on account of said property, and the balance of the selling price shall be considered the net profits of the transaction; which net profits are to belong to and be payable to the parties hereto as follows:

"Two-thirds of said net profits to first parties and one-third of said net profits to second parties.

"(8) If the parties of the first part desire to obtain other lands within the neighborhood of lands purchased from The Allegheny Lumber Company and The Conewango Lumber Company herein referred to, the parties of the second part will assist them therein, in obtaining options thereon, examining, cruising and reporting on said lands, and if the same are acquired

the purchase price shall be paid by the parties of the first part and the said lands shall be held, cared for, maintained, sold and the net proceeds thereof divided between the parties hereto in the same proportions and in a similar manner and upon similar conditions in all respects as hereinbefore provided with respect to lands described in annexed copies of deeds.

"(9) This contract shall be operative between the heirs, executors, administrators and assigns of the re- spective parties hereto as fully to all intents and pur- poses as if they were named herein in each instance with the parties hereto.

"In Witness Whereof, the parties hereto have ex- ecuted this agreement in triplicate the day and year herein first above written.

"Charles H. Ruddock
"Timothy H. McCarthy
"James D. Lacey & Company
"By Victor Thrane."

In the year 1922, James D. Lacey & Company was duly organized as a corporation, and thereafter by as- signment succeeded to the rights of the co-partnership of James D. Lacey & Company under the contract. The partners then became the stockholders and officers of the corporation. In September, 1929, Charles H. Ruddock died, and soon thereafter Albert Billings Rud- dock became the executor of his estate. We shall for convenience refer to James D. Lacey & Company as Lacey & Company; to Timothy H. McCarthy as Mc- Carthy; and to Charles H. Ruddock, deceased, and Al- bert Billings Ruddock, executor, as Ruddock. The con- text will show which of the latter is meant.

The breach of the contract, as alleged by Lacey & Company, consisted of McCarthy and Ruddock refus- ing to sell or entertain any proposition for the sale of the lands at a time when a reasonable profit could have been obtained by a sale, or a contract for the sale of the lands, as contemplated by the contract; which prof-

it Lacey & Company alleged would have been more than $1,000,000, over and above the expenditures made by McCarthy and Ruddock under the contract, with simple interest upon the several items of such expenditures.

McCarthy answered separately, denying the principal allegations of the complaint, other than the making of the contract, and affirmatively alleging facts by way of affirmative defenses. Ruddock answered separately, denying the principal allegations of the complaint, other than the making of the contract, and affirmatively alleging facts by way of affirmative defenses.

Ruddock filed a cross-complaint against McCarthy, alleging, in substance, that McCarthy alone breached the contract, if any breach thereof occurred, and prayed for judgment over against McCarthy in the amount of any judgment which might be recovered in the action by Lacey & Company against him. McCarthy responded to the cross-complaint of Ruddock by general denials and affirmative allegations.

The cause proceeded to trial in the superior court, sitting without a jury, resulting on August 21, 1931, in a judgment awarding to Lacey & Company recovery against McCarthy separately in the sum of $44,944, awarding to Lacey & Company recovery against Ruddock separately as executor in the sum of $22,641, and denying recovery over by Ruddock against McCarthy. From this disposition of the cause in the superior court, McCarthy appealed on September 17, 1931, Ruddock appealed on September 18, 1931, and Lacey & Company appealed on September 19, 1931.

None of the parties to the contract seemed to have entertained any serious thought of the probability of disposing of the lands at a reasonable profit until about the year 1926. Lacey & Company, then realizing that

the time had arrived when it was advisable to seriously undertake disposition of the lands, as contemplated by the contract, began its efforts in that behalf. It received tentative offers from large responsible timber concerns to negotiate looking to their purchase of the lands for the purpose of removing and marketing the timber thereon. Up to the fall of 1928, these offers did not assume any very definite form, though they did point somewhat convincingly to the fact that the lands could then be sold or contracted for sale at a price and upon terms which would bring a substantial profit to all parties to the contract.

Lacey & Company was not given any encouragement by McCarthy or Ruddock looking to such disposition of the lands. Indeed, they would not even name a price which they would be willing to take, so that Lacey & Company had no basis upon which to work looking to a profitable disposition of the lands.

In November, 1928, Lacey & Company had interested Larson Lumber Company as a prospective purchaser of the lands. This resulted in Larson Lumber Company submitting to Mr. G. C. Rainey, who was representing Ruddock, the following proposition:

"LARSON LUMBER COMPANY
"Pacific Coast Forest Products
"Mr. G. C. Rainey,        Seattle November 22, 1928
"1300 Quinby Building,
"Los Angeles, Cal.
"Dear Mr. Rainey:

"The following is in confirmation of an offer made you at my office on November 15th:

"(1)  We will pay a total consideration of two million, seven hundred and fifty thousand dollars ($2,750,-000) for approximately eight thousand (8000) acres of timber land owned by Ruddock-McCarthy in Clallam county.

586

"(2) Payments are to be made as follows:
On or before February 15, 1929.........$100,000
On or before August 15, 1929......... 100,000
On or before February 15, 1930......... 300,000
On or before February 15, 1931......... 400,000
On or before February 15, 1932......... 400,000
On or before February 15, 1933......... 450,000
On or before February 15, 1934......... 450,000
On or before February 15, 1935......... 550,000

TOTAL CONSIDERATION.............$2,750,000

"Interest at 6%, payable annually.

"(3) The first two hundred thousand dollars ($200,-000) paid are to be down payments on the property in consideration of a contract of purchase stipulating payments as above outlined, and to continue throughout its life, and to be forfeited in case of default.

"(4) We will make a contract for the release of timber on the payment in advance of any legal subdivision, the same as in the Clallam Lumber Company contract; we would prefer to make a release agreement on a cutting basis the same as our contracts No. 1, No. 2, and No. 3 with the Clallam Lumber Company, which permits us to cut the timber and make returns monthly on the fifteenth of each month, for timber cut. The release value should be five dollars ($5.00) per thousand feet, which would give you reasonable protection for unpaid balance. These payments made from time to time should be credited on the next payment due, and interest cease when payments are made. Any surplus cut in one year over and above the payment then due should be credited on the following year. The whole, however, is to be paid for whether cut or not, within the time specified.

"(5) In case of acceptance of our offer as above stated, it is understood that a formal contract of purchase and sale will be entered into containing such other and further covenants and stipulations as may be satisfactory to both parties. We are making the above offer good until January 1st, 1929.

"Yours very truly,
"LARSON LUMBER COMPANY
"J. H. Bloedel, President."

We may assume that Ruddock was then willing to contract for the disposition of the lands upon the terms of this proposition. In any event, he sent Rainey to Paris, France, to submit this proposition to McCarthy, who was then residing there. McCarthy refused to consider the proposition, or to name any price or terms looking to the disposition of the lands.

On February 7, 1929, Ruddock entered into a contract with Larson Lumber Company for a sale to it of his half interest in the lands; the sale to become effective only upon a decree of partition of the lands between him and McCarthy, Ruddock agreeing to institute and prosecute to final determination a partition suit against McCarthy looking to that end. That contract reads in part as follows:

"(3) The Vendor, in consideration of the sum of one million two hundred and fifty thousand dollars ($1,250,000), to be paid by the Vendee, and of the due performance by the Vendee of the other covenants hereinafter expressed, does hereby sell to the Vendee subject to the conditions hereinafter expressed, all those certain pieces, parcels, legal subdivisions and descriptions of land included and described in paragraph (1) hereof as shall be set apart and decreed to be the sole and separate property of the Vendor by the final decree of partition in said suit above-mentioned. The Vendee herein does hereby covenant and agree to purchase said lands subject to the conditions named in this contract and to pay the consideration above named to the Vendor, and to perform each and all of the covenants, terms and conditions specified herein to be performed by the Vendee.

"(4) The purchase price of said property shall be paid by the Vendee to the Vendor as follows: Twenty-five thousand dollars ($25,000) cash, the receipt whereof is hereby acknowledged, and the balance as follows:

"Upon the entry of said final decree of partition, seventy-five thousand dollars ($75,000); six months thereafter fifty thousand dollars ($50,000); one year

thereafter one hundred and fifty thousand · dollars ($150,000); two years thereafter, one hundred and fifty thousand dollars ($150,000); three years thereafter, two hundred thousand dollars ($200,000); four years thereafter, two hundred thousand dollars ($200,-000); five years thereafter, two hundred thousand dollars ($200,000); and six years thereafter, two hundred thousand dollars ($200,000).

"The Vendee shall pay the Vendor interest upon deferred payments at the rate of six per cent. (6%) per annum, payable annually, said interest to commence upon the entry of a final decree in said partition suit above mentioned."

Suit was accordingly commenced soon thereafter, and resulted in a decree of partition of the land between Ruddock and McCarthy, which became final upon appeal on October 13, 1930, setting apart to Ruddock as his sole and separate property one-half of the lands, describing the lands so set apart to him. Thereupon, that contract became effective.

Viewing the maintained attitude of McCarthy in his impeding of the efforts of Lacey & Company to dispose of the lands to the profit of the parties to the contract, it seems plain to us that McCarthy breached the contract to the damage of Lacey & Company, assuming for the present that Lacey & Company could have brought about a disposition of the lands at a reasonable profit to the parties to the contract; and, since Ruddock and McCarthy were jointly bound "as first parties" to the contract, Lacey & Company being "second parties" thereto, it seems to us that such breach by McCarthy consisted also, in legal effect, of a breach by Ruddock, in so far as the rights of Lacey & Company thereunder are concerned.

Now, when did such breach of the contract by McCarthy and Ruddock occur? Manifestly, this cannot be determined with any degree of exactness; yet

we must determine and adopt some date when the breach occurred, though we may be able to do so only approximately. This is necessary, to the end that we may know the amount of expenditures made by McCarthy and Ruddock under the contract, for which they may be entitled to credit with interest thereon. We must also determine, as of the same date, the amount of cash or present worth for which the land could have been disposed of had McCarthy and Ruddock jointly fairly cooperated with Lacey & Company looking to the disposition of the lands to the profit of the parties to the contract.

Under all the circumstances here appearing, which we do not feel called upon to further review in detail, we are of the opinion that, on or before December 31, 1928, Lacey & Company could have effected a sale of the lands for $2,000,000, or could have effected a contract for the sale of the lands on terms which would have been of the then present worth of at least $2,000,000, had McCarthy and Ruddock jointly cooperated in good faith with Lacey & Company to that end, as they were bound to do under the contract as coadventurers.

As we understand this involved record, on that date McCarthy and Ruddock had expended under the contract $815,886.14, and were entitled to interest, computed as simple interest, on the items of such expenditures in the amount of $733,970.39, making their total just charge against the joint adventure $1,549,856.53, resulting in a total profit of approximately $450,000, which amount we adopt as the real total profit as near as can be determined from this involved record. Thus, Lacey & Company then was entitled to a profit of one-third of that amount, that is, $150,000, which becomes its measure of total damages against McCarthy and Ruddock, unless we must hold that Mc-

Carthy and Ruddock are entitled to compound interest on their expenditures under the contract.

It is contended in behalf of Lacey & Company that McCarthy and Ruddock are not entitled to compound interest upon their expenditures under the contract. While the trial judge did not make any findings of fact or render any written decision clearly advising us as to the theory upon which he fixed the amount of recoveries he awarded to Lacey & Company against McCarthy and Ruddock, he apparently did proceed upon the theory that McCarthy and Ruddock were entitled to compound interest upon their expenditures under the contract. This, we think, was erroneous. The language of the contract relating to interest is:

"They [McCarthy and Ruddock] will charge interest on the amount of their investment and all other expenditures made by them at the rate of six per cent per annum, making the first charge hereafter on December 31, 1906, and annually thereafter, and credit themselves on said books accordingly."

We do not see in this language any express agreement that McCarthy and Ruddock shall have compound interest upon their expenditures under the contract. The mere fact that they may annually charge the interest upon their books does not, we think, mean that such charges shall also bear interest. This is analogous to the usual words in an ordinary interest bearing money obligation that interest shall be "payable annually." Those words in such an obligation do not constitute an agreement to pay compound interest.

In *Cullen v. Whitham*, 33 Wash. 366, 74 Pac. 581, the note in question read in part: "With interest at ten per centum per annum, payable annually." Holding that these words do not constitute an agreement to pay compound interest, Judge Fullerton, speaking for the court, said:

"To create an obligation to pay compound interest there must be an agreement to pay interest upon interest, otherwise there is no legal obligation on the part of the borrower to do so; it is not enough that the note provides for the annual payment of interest. To agree to pay interest annually does not make the accumulated interest a separate debt in the sense that it will draw interest per force of the statute without any further promise to pay interest thereon; on the contrary, there must be a direct promise to do so before such an obligation arises."

We are not aware of any expression of this court out of harmony with this view of the law.

We have not overlooked a number of statements of account sent from the office of McCarthy and Ruddock from time to time to Lacey & Company, showing interest charges compounded upon their books against the joint adventure, and the apparent acquiescence therein by the silence, for the most part, of Lacey & Company, and upon one or two occasions by the acknowledgment of the receipt of such statements containing language which may be construed as tentatively approving such charges. This, we think, was not a practical construction of the contract in the sense that either Lacey & Company or McCarthy and Ruddock did anything in the way of executing the contract having the effect of estoppel in favor of one as against the other.

McCarthy and Ruddock, in their affirmative defenses, pleaded facts upon which they prayed for reformation of the contract so as to expressly provide for compound interest upon their expenditures thereunder; this in the alternative in the event the contract be construed as not so providing. We deem it sufficient for us to say that we think the evidence falls far short of supporting such prayer.

We conclude that McCarthy and Ruddock are not entitled to compound interest as claimed by them.

■ It is contended in behalf of McCarthy and Ruddock that the partition suit and the decree therein partitioning the lands between them became, in legal effect, an adjudication of the rights of Lacey & Company under the contract, as well as of the rights of McCarthy and Ruddock as between themselves. This contention is rested upon the theory that Lacey & Company so participating in that suit made Lacey & Company, in effect, a party to it, though Lacey & Company was not a named party to it.

That suit was not commenced until sometime after December 31, 1928, the approximate date, as we have determined, of the breach of the contract by McCarthy and Ruddock, which gave rise to the cause of action upon which Lacey & Company has sued. Nothing was sought or determined in that partition suit other than a partition of the lands as between McCarthy and Ruddock, they being the holders of the title to and the real owners of the lands.

It does appear that Lacey & Company aided Ruddock in that suit in bringing about that adjudication. This, we are of the opinion, resulted in Lacey & Company being bound by that adjudication, in so far as it effected a severance of the interests of McCarthy and Ruddock, so that thereafter their liability to Lacey & Company under the contract became as to each of them a separate liability and not a joint liability; but did not in any other respect become an adjudication of the rights of Lacey & Company under the contract.

■ It is contended in behalf of Ruddock that Lacey & Company did not timely present and file its claim against the estate of Charles H. Ruddock, deceased, prior to its commencement of this action. It appears that this action was originally commenced on February

18, 1930, by the filing of a complaint in the office of the clerk of the superior court. Apparently, the defendant Ruddock as executor of the estate of Charles H. Ruddock, deceased, was not served with any summons upon or accompanied by that original complaint.

On March 15, 1930, a duly verified claim demanding the damages sued for by Lacey & Company was served upon Ruddock as executor and filed in the probate proceeding, which claim was rejected by Ruddock as executor. Thereafter, on April 3, 1930, Lacey & Company caused to be served upon Ruddock as executor a summons accompanied by its amended complaint, which complaint alleged the serving and filing of the claim. This, so far as can be determined from this record, was the first service of summons or complaint in the action upon Ruddock as executor.

This, we think, must be regarded as, in legal effect, the commencement of the action as against Ruddock as executor, for the purposes of determining whether or not the claim was timely presented and filed. All of this was well within the six months' period for the presentation and filing of claims against the estate of Charles H. Ruddock, deceased. We conclude that the claim was timely presented and filed.

It is contended in behalf of Ruddock that, to whatever extent he as executor shall be held liable to Lacey & Company, he should be awarded judgment over against McCarthy. What we have already said, we think, negatives this contention. There is room for arguing that McCarthy was most at fault in the breach of the contract. However, Ruddock, as we have seen, actually disposed of his one-half of the partitioned lands for a price and upon terms which constituted a present worth of at least $1,000,000. Under the circumstances, we conclude that Ruddock as executor is not entitled to a judgment over against McCarthy.

594

Other contentions made in behalf of the respective parties have received our careful attention. We deem it sufficient to say that we do not think that any of them is well grounded.

We conclude that Lacey & Company is entitled to a separate judgment against McCarthy in the sum of $75,000; that Lacey & Company is entitled to a separate judgment against Ruddock as executor in the sum of $75,000; and that Ruddock as executor is not entitled to any judgment over as against McCarthy. The cause is remanded to the superior court, with directions to enter a corrected judgment accordingly, as of August 21, 1931, the date of its judgment.

Lacey & Company shall be awarded its costs and disbursements incurred upon prosecuting its appeal to this court, one-half thereof against McCarthy and one-half thereof against Ruddock as executor. We conclude that there shall be no costs awarded in this court as between McCarthy and Ruddock as executor.

TOLMAN, C. J., MITCHELL, HOLCOMB, HERMAN, BEALS, MAIN, and MILLARD, JJ., concur.